**Supreme Court**

No. 2011-398-C.A.

(P1/09-3674A)

State                    :

v.                     :

Markus Matthews.               :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|          |     |
| -------- | --- |
| State    | :   |
| v.       | :   |
| Markus Matthews. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  On the night of May 6, 2009, three men savagely attacked and robbed Cesar Lopez (Lopez or complainant), who had unwittingly arrived at an abandoned house to deliver pizza.  The attackers made off with about $20.  Several days later, a chance encounter with one of the robbers led to his arrest, and that perpetrator implicated the defendant, Markus Matthews (defendant), in this brutal crime.  The defendant was tried and convicted by a jury of a single count of first-degree robbery.  He now appeals that conviction, assigning an array of errors to the trial court.  For the reasons set forth below, we affirm the conviction.

**Facts and Travel**

Cesar Lopez was employed by Domino's Pizza (Domino's) as a pizza delivery-person. On May 6, 2009, he drove to 54 Lynch Street in Providence to make a delivery.  Upon arriving at that address, Lopez called the phone number associated with the order, and the voice on the other end told him to "go through the back door."  Although something about the situation appeared amiss, particularly because the house was dark, Lopez attempted to fulfill the delivery.

- 1 -

As Lopez exited his vehicle, he was struck from behind with "a piece of tubing."[1]  As a second attacker grabbed him, he heard someone say "bring him into the house."  While Lopez was being moved toward the house, there was one man in front, wearing a blue and white bandana over his nose, and another assailant behind him, with his arm around Lopez's neck.  When Lopez tried to turn around, the choke-hold tightened, almost to the point of strangulation.  Lopez briefly was able to free himself, but was then struck on the leg with the pipe and dragged up the driveway toward the house.

As the attackers moved Lopez toward the house, the beating continued.  According to Lopez, there were three assailants: one with the pipe and two men pummeling with their fists.  Lopez testified that he was struck with the pipe on the head and left eye.  Approximately $20 was taken from his pocket.  As the attackers wrestled him toward the back door of the house, he was able to grab onto the handrail; the attackers repeatedly hit him in an effort to make him let go of the railing.  At that point, Lopez fought back.  The assailants grabbed his uniform shirt; he slipped out of it and escaped to his car.  The assailants were left holding the shirt.  After Lopez reached the street, the attackers retreated and, despite his injuries—one eye was completely closed—he was able to drive back to Domino's.  When he arrived, he sounded the horn, exited the car, and collapsed.  Lopez's co-workers helped him up and called 911.  Lopez continues to have problems with his eyesight and suffers from headaches.

On May 10, 2009, Lopez visited Domino's in order to return some items belonging to the store, including his uniform and pizza bag.  While driving there with his wife, Lopez saw one of his attackers who was loitering on the street.  According to Lopez, when the attacker saw him, he "started doing some suspicious things," such as backing up so that Lopez could not see him.

---

[1] It appears from the testimony that the "tubing" was a metal pipe.

After his wife called the police, they decided to circle the block; when the alleged attacker saw the car again, he went into a driveway and came out onto another street. Lopez directed his wife to drive to another street, where he expected the attacker to appear. Upon seeing Lopez again, the assailant started running with Lopez in pursuit. After a foot chase, Lopez caught the attacker—Michael Long—and held him until the police arrived.

The police arrested Long for the May 6, 2009 robbery and proceeded to interview him. Long initially denied any involvement in the crime, but eventually confessed, and in so doing, he implicated defendant.[2] Based on statements made by Long, defendant was apprehended. Long later pled nolo contendere to charges of robbery and conspiracy to rob.

At trial in this case, the complainant testified about the attack, noting that he could not recall the exact time that he left to deliver the pizza, but that it was after 10 p.m.[3] He also testified about the circumstances that led to Long's arrest. The state also called Long to testify; however, he professed to have no memory of the events, notwithstanding his confession and subsequent plea. Jeannine Labossiere, Michael Long's former fiancée and the mother of his child, also testified at trial, and her memory was intact. She testified that, at about 10:30 p.m. on May 6, 2009, Long borrowed her cell phone and left her apartment. Labossiere testified that he was gone until about 1 a.m. when he returned to her house, accompanied by defendant. She testified that after some prodding, Long disclosed the beating and robbery of a Domino's delivery-person, as defendant stood silent. The defendant neither contested nor denied Long's recital of the events of the evening. Labossiere also testified that her cell phone number matched

---

[2] Long implicated defendant in both versions that he gave to police, including when he denied his own involvement. Long also implicated a third man referred to as "Knowledge" in his recorded statement.

[3] The owner of the Domino's Pizza testified that his establishment's tracking system indicated that the call came in at 11:17 p.m.

the one used to call Domino's on May 6, 2009. Because the testimony of both Long and Labossiere are central to the issues in this case, we elaborate upon their testimony in the discussion below.

The defendant testified in his own defense and denied any involvement in this crime. He claimed that he was not at 54 Lynch Street on the night of May 6, 2009, having left Labossiere's house at about 9:30 p.m., arriving home a little after 10 p.m. The defendant's mother also testified, corroborating her son's alibi. The jury was unconvinced.

The trial justice instructed the jury that they were to consider three charges against defendant. The trial justice told the jury that defendant was charged with first-degree robbery, but that it was alleged to have been committed under two different theories: "The first theory is that [defendant did] rob Cesar Lopez by use of a dangerous weapon. The second, or alternative, theory is he did rob Cesar Lopez and Cesar Lopez was, in fact, injured." Later, the trial justice told the jury,

> "There's only one robbery being charged but two factual elements that are different from each count. One is the dangerous weapon; one is the injury. You make separate decisions for each one. But they clearly are one count, one charge of the robbery. He's not being charged with two separate counts of robbery."

Additionally, defendant was charged with conspiracy to rob.

The jury returned verdicts of not guilty on first-degree robbery by means of a dangerous weapon and the conspiracy count. The defendant, however, was found guilty of first-degree robbery resulting in injury. The defendant's motion for a new trial was denied by the trial justice, who subsequently sentenced defendant to twenty years at the Adult Correctional Institutions, with nine years to serve and the remaining eleven years suspended with probation.

**Analysis**

**I**

**Double Jeopardy**

Count 1 of the indictment charged that defendant "on or about 6th day of May, 2009, in the City of Providence, in the County of Providence, did rob Ceasar Lopez by use of a dangerous weapon * * * ." Similarly, count 2 of the indictment charged that defendant "on or about 6th day of May, 2009, in the City of Providence, in the County of Providence, did rob Ceasar Lopez causing him to be injured * * * ." The defendant argues that his conviction for first-degree robbery must be vacated because "[c]harging one robbery as two crimes and permitting the jury to deliberate twice on one robbery violated double jeopardy principles."

Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure provides that "[t]he defense of double jeopardy * * * may be raised <u>only by motion before trial</u>." (Emphasis added.) "[A] defendant's failure to raise such a motion before trial precludes that defendant from thereafter raising a double jeopardy challenge." <u>State v. Day</u>, 925 A.2d 962, 977 (R.I. 2007) (citing <u>State v. Feliciano</u>, 901 A.2d 631, 647 (R.I. 2006)). In this case, defendant did not comply with the provisions of Rule 12(b)(2) and, therefore, has waived this argument.

Nonetheless, we deem it appropriate to address two important issues. First, were this issue properly before the Court, we would affirm defendant's conviction because we are satisfied that defendant's double jeopardy contentions are without merit. The principal evil against which the Double Jeopardy Clause protects—multiple criminal punishments for the same offense—is not implicated in this case because defendant stands convicted of (and punished for) a single offense. <u>See</u> <u>Hudson v. United States</u>, 522 U.S. 93, 99 (1997) ("The [Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense

- 5 -

* * * .") (emphasis omitted); see also 1A Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure: Criminal § 142 at 11-12 (4th ed. 2008) ("It remains permissible to charge a single offense in several counts (although not to convict and punish on more than one for a single crime) * * *."). Additionally, this Court has noted that "it would be impermissible to charge a defendant with murder in the second degree and, subsequent to disposition of the charge, then charge him or her with first-degree murder," but that "[t]rial of lesser-included offenses contemporaneously with the trial for the greater offense does not violate principles of double jeopardy." State v. Grabowski, 644 A.2d 1282, 1286 (R.I. 1994). Although the two separate factual predicates for first-degree robbery here do not constitute a primary and a lesser-included offense, the same principle nonetheless applies because they are alternative theories of guilt. Furthermore, the trial justice's instruction to the jury mollified the risk that the indictment would result in unconstitutional multiple punishment. The trial justice instructed the jury that the indictment alleged two different theories of robbery, and, later in the instruction, she stated that the two robbery charges "clearly are one count, one charge of robbery. He's not being charged with two separate counts of robbery."

The defendant argues that in accordance with our decision in State v. Bolarinho, 850 A.2d 907 (R.I. 2004), this Court must vacate defendant's conviction. We agree that the issues presented in Bolarinho are similar, but we disagree that our holding compels the remedy sought by defendant. In Bolarinho, 850 A.2d at 908-09, the defendant was convicted of two offenses—felony assault resulting in serious bodily injury and felony assault by means of a dangerous weapon, a shod foot. It was clear, however, that both crimes arose from the same assault. Id. at 911. This error was remedied by our decision that vacated the conviction on count 1—assault resulting in serious bodily injury. Id. We did not vacate both convictions and order a new trial.

See id. Here, defendant contends that the Bolarinho remedy cannot be invoked because the jury found him not guilty on count 1; and that, therefore, the Court must vacate the conviction and order a new trial because defendant "cannot be both innocent and guilty of the same crime." We reject this argument. In this case, defendant was found guilty, beyond a reasonable doubt, of the offense of first-degree robbery that resulted in injury. The jury was not satisfied that the state had proven robbery by means of a dangerous weapon. Simply because the jury rejected this theory of robbery, that fact does not impact the Double Jeopardy Clause. Because there was a single conviction in this case, there is no double jeopardy violation for us to remedy. See id. Additionally, we are not confronted with inconsistent verdicts. Because the prosecution had two theories of robbery, the jury could have concluded that both theories were proven beyond a reasonable doubt, or that defendant robbed Lopez causing bodily injury, but the state did not prove that defendant used a dangerous weapon in the process. Nevertheless, a conviction of a single count of first-degree robbery would result.

Second, we provide guidance to the trial court and its practitioners in order to avoid confusion when a single offense is charged under multiple theories. Initially, we note that a bill of particulars is designed to cure any potential problems with the indictment in the early stage of a prosecution; however, defendant did not file for a bill of particulars in this case. Contrast Pierce v. Wall, 941 A.2d 189, 194 (R.I. 2008) ("The record discloses that a bill of particulars was filed in this case that made clear that a single act was charged in each of the seven counts."). Furthermore, although a permissible practice, charging defendant with two separate counts of first-degree robbery is not the ideal manner in which to draft an indictment. The preferable manner is to charge a single offense as one count, setting forth multiple theories that may be alleged. See Sanabria v. United States, 437 U.S. 54, 66 n.20 (1978) ("A single offense should

- 7 -

normally be charged in one count rather than several, even if different means of committing the offense are alleged."). General Laws 1956 § 12-12-1.4 provides in pertinent part, "An indictment, information, or complaint shall be a plain, concise, and definite written statement of the offense charged." Nothing in this section precludes the assertion of multiple theories in a single count. Additionally, Rule 7(c) of the Superior Court Rules of Criminal Procedure permits such a procedure: "It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he [or she] committed it by one or more specified means." (Emphasis added.) Although it may be constitutionally permissible to charge a single offense in several counts, we reiterate that "the rules are intended to discourage that practice." Wright and Leipold, § 142 at 12 (discussing identical federal rule). As the Eighth Circuit recently stated:

> "[W]here a 'statute specifies two or more ways in which one offense may be committed, all may be alleged in the conjunctive in one count of the indictment, and proof of any one of the methods will sustain a conviction.' * * * This method of procedure would adequately inform the defendant of each allegation that he must defend against while solving any potential multiplicity problems." United States v. Roy, 408 F.3d 484, 492 n.4 (8th Cir. 2005) (quoting Gerberding v. United States, 471 F.2d 55, 59 (8th Cir. 1973) (emphasis added)).

Ultimately, when confronted with a single offense in an indictment from which a jury could conclude that the offense was committed under one or more theories, it is the trial justice's responsibility—through instructions to the jury and a carefully drafted verdict form—to ensure that a defendant stands convicted, if at all, of a single offense.

An indictment or criminal information that charges one offense having been committed by multiple means is a fair solution for both the state and the defendant. It lessens, or eliminates, any potential double jeopardy concerns, because it ensures that the accused is charged with a single offense, and thus, can only be convicted and sentenced on a single count. It also addresses

duplicity issues because the jury would have to state which theory or theories were proven beyond a reasonable doubt.[4] Requiring a jury to deliberate on each factual predicate alleged in the charging document is also fair to the state because it permits the jury to find that the state proved multiple theories, but only one offense—a practice that permits a complete examination of the sufficiency of the evidence in the event that there is a motion for a new trial.

## II

### Admission of Michael Long's Recorded Statement

The defendant wages a multi-pronged attack against the use at trial of Michael Long's statement to police following his arrest. As noted, when he testified during the state's case-in-chief, Long suffered from the ubiquitous failure of memory of a confessing codefendant. Long admitted that he participated in the robbery of a pizza delivery-person on May 6, 2009, and that he was serving a sentence at the Adult Correctional Institutions for that crime. However, he claimed to remember almost nothing else about that night or his arrest on May 10, 2009. The prosecutor attempted to refresh Long's recollection by showing him the statement that he gave to police after he was arrested; this proved futile because Long repeatedly denied that his recollection was refreshed. Long not only professed a failure of memory about the statement, he refused to acknowledge his own voice on the tape recording. When confronted with defendant's photograph—the one he identified when he was arrested—Long recognized defendant as the person in the photograph; however, he denied that it was his signature below the picture, despite acknowledging that the name looked like "Michael Long" and the date was "5/10/09." When the

---

[4] "The term 'duplicity' refers to the joining of two or more offenses, however numerous, in a single count of an indictment." State v. Saluter, 715 A.2d 1250, 1253 (R.I. 1998). The problem with duplicity is that "a guilty verdict on a duplicitous indictment does not indicate whether the jury found defendant guilty without having reached [a] unanimous verdict on the commission of a particular offense." Id. (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)).

prosecutor asked Long whether he remembered the interrogation at the Providence police station, Long responded, "I don't know what happened five minutes ago."

In the face of Long's recalcitrance and refusal to acknowledge that his recollection was refreshed in any way, the prosecutor began asking specific leading questions about Long's statement to police. At this point, defense counsel raised an objection to "the further continuance of [the prosecutor's] line of questioning" and argued at sidebar that Long's statements did not qualify as prior inconsistent statements. The trial justice, however, analogized this case to two prior opinions of this Court[5] and stated, "I think that I am going to make a finding that at the appropriate time it's a prior inconsistent statement."[6] The prosecutor continued asking specific leading questions after Long continued to claim that his recollection had not been refreshed. These questions included statements by Long that he punched the complainant and that defendant hit him with a lead pipe. Later, during the testimony of a Providence police detective, the recording of the interview was admitted as a full exhibit and played for the jury.[7]

The defendant raises issues under the Rules of Evidence, the Confrontation Clause, and the Due Process Clause. His primary argument is that Long's statements were inadmissible hearsay and violative of the Confrontation Clause. Although defendant contends that "[t]he arguments against admissibility are the same under [Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence] and the Confrontation Clause," such is not the case. See Crawford v.

_____

[5] We discuss these cases below; they are State v. McManus, 990 A.2d 1229 (R.I. 2010) and State v. Jaiman, 850 A.2d 984 (R.I. 2004).

[6] Although the trial justice stated this in the future tense, it appears that counsel took this as the trial justice's definitive ruling.

[7] When the state moved for admission, defense counsel objected and noted the previous sidebars. The court asked whether defense counsel wanted further argument, but defense counsel declined. The trial justice then stated, "Same ruling. May be marked." Transcripts of the recording were provided as aids for the jury, but the transcripts were not admitted as full exhibits.

<u>Washington</u>, 541 U.S. 36, 61 (2004) ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"). Therefore, we will consider these arguments separately.

## A

### Rule of Evidence 801(d)(1)(A)

"The applicable standard of review of a trial justice's admission of evidence is a clear abuse of discretion." <u>State v. McManus</u>, 990 A.2d 1229, 1234 (R.I. 2010). Rule 801(d)(1)(A) provides: "A statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * inconsistent with the declarant's testimony * * *." The trial justice allowed examination based on Long's prior statements and admitted the recording of his statement under this rule. We conclude that the trial justice did not abuse her discretion in doing so.

We have addressed nearly identical situations in two previous opinions. In <u>State v. Jaiman</u>, 850 A.2d 984, 986 (R.I. 2004), a key witness "suffered a convenient failure of memory, declaring over and over again, especially at critical points about details of [a] drive-by shooting, that he had difficulty remembering the events of [the evening of the shooting]." At trial, the state introduced portions of the witness's police statement, and, on appeal, the defendant argued that the statement should not have been admitted under Rule 801(d)(1)(A). <u>Jaiman</u>, 850 A.2d at 986, 987. This Court concluded that "the provisions of Rule 801(d)(1)(A) have been satisfied and that [the witness] was subject to cross-examination within the meaning of the rule." <u>Jaiman</u>, 850 A.2d at 990. In <u>McManus</u>, 990 A.2d at 1232, a witness who had been approached by the defendant to engage in a murder for hire scheme "professed a total failure of memory about

- 11 -

everything concerning the incident, including his discussions with the state police." The prosecutor questioned the witness as an adverse witness and used leading questions over defense counsel's continuing objection. Id. We held that the introduction of the witness's police statement was proper under Rule 801(d)(1)(A). McManus, 990 A.2d at 1236. Permitting this kind of examination in the face of a witness's convenient failure of memory is consistent with a prominent treatise on the law of evidence:

> "Where a witness no longer remembers an event, a prior statement describing that event should not be considered inconsistent. Yet the tendency of unwilling or untruthful witnesses to seek refuge in a claim of forgetfulness is well recognized. Hence the judge may be warranted in concluding under the circumstances the claimed lack of memory of the event is untrue and in effect an implied denial of the prior statement, thus qualifying it as inconsistent. The case law readily accepts this position." 2 McCormick on Evidence, § 251 at 214 (7th ed. 2013).

We discern no difference between this case and our prior holdings in Jaiman and McManus. Here, Long similarly professed a lack of memory regarding almost all of the facts salient to the robbery and his subsequent arrest, including his own signature and the sound of his voice. Thus, it was permissible for the prosecutor to question him about the details of his statement to police in an attempt to refresh his recollection and for the trial justice to admit the recording. It was for the jury to determine whether Long's refusal to admit his recollection was refreshed was in fact a denial of the prior statement and therefore, a prior inconsistent statement of a testifying witness. Accordingly, the trial justice did not abuse her discretion by admitting the statements under Rule 801(d)(1)(A).

**B**

**Confrontation Clause**

This Court reviews issues of constitutional dimension on a de novo basis. State v. Oliveira, 961 A.2d 299, 308 (R.I. 2008) ("This Court undertakes a de novo review of questions

- 12 -

of law, as well as mixed questions of law and fact, that involve issues of constitutional dimension."). The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Although not articulated with perfect clarity, defendant's Confrontation Clause argument seems to suggest that, despite his physical presence on the witness stand, Long was unavailable for cross-examination because of his professed lack of memory.

The seminal case in modern Confrontation Clause jurisprudence is <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). In <u>Crawford</u>, the Supreme Court recognized that the Confrontation Clause provides a procedural, rather than substantive, guarantee that evidence be tested by cross-examination:

> "[T]he [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." <u>Id.</u> at 61.

Nevertheless, <u>Crawford</u> also declared, "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." <u>Crawford</u>, 541 U.S. at 60 n.9. In this case, the declarant—Long—appeared at trial and was subject to cross-examination, including cross-examination with the contents of his prior statement. Additionally, defense counsel questioned Long about his plea deal, his arrest, and a possible love affair between defendant and Labossiere.

The defendant relies upon two United States Supreme Court cases for his Confrontation Clause argument. In <u>Douglas v. Alabama</u>, 380 U.S. 415, 416 (1965), the witness called to testify was a previously convicted codefendant who invoked his privilege against self-incrimination

when he took the stand. After the judge ordered the witness to answer and he again refused, the prosecutor read from a document purporting to be a signed confession by the witness and, every few sentences, asked the witness whether he made the statement. Id. The witness continued to assert the privilege and to refuse to answer. Id. at 416-17. The Supreme Court held that the defendant's inability to cross-examine the witness regarding the confession denied the defendant his right of cross-examination under the Confrontation Clause. Id. at 419. Here, Long did not refuse to testify based on any Fifth Amendment privilege; rather, he testified that he had no memory about the statement but was, in fact, available for cross-examination. Although his responses were not particularly helpful, they were substantive in that he stated that he did not remember making the statement and did not recognize the sound of his own voice or his signature; Long did not deny making the statement to police. Further, on cross-examination, defense counsel asked a number of questions about the circumstances surrounding Long's statement, and Long answered those questions.[8] Thus, we cannot say that Long was not available for cross-examination as is a witness who claims a privilege against self-incrimination and refuses to answer any questions at all.

The defendant also cites Lee v. Illinois, 476 U.S. 530 (1986), to support his Confrontation Clause argument. Because the reasoning of Lee is fundamentally at odds with the reasoning of Crawford, its continued viability is dubious. Compare Crawford, 541 U.S. at 63 (rejecting an "indicia of reliability" framework as "so unpredictable that it fails to provide meaningful protection from even core confrontation violations") with Lee, 476 U.S. at 539

---

[8] For example, when shown the rights form that he signed, Long acknowledged that he signed the form at 6:12 p.m.; when shown the transcript of the recorded statement, Long acknowledged that it did not start until 6:52 p.m. Defense counsel then asked a number of questions about what happened in the time between the signing of the rights form and the start of the recording. Long responded that he did not remember having a conversation with the police officers before they turned the recorder on, but that they "said something about the robbery."

(holding that the witness's statement was "presumptively unreliable and that it did not bear sufficient independent 'indicia of reliability' to overcome that presumption"); see also State v. Moten, 64 A.3d 1232, 1240 (R.I. 2013) (noting that Crawford definitively abrogated the "indicia of reliability" framework as announced in Ohio v. Roberts, 448 U.S. 56 (1980)). Regardless of the legal reasoning, the facts of Lee are inapplicable here because the confessing codefendant witness in Lee never took the stand. See Lee, 476 U.S. at 536.

Accordingly, we are satisfied that the use of Long's prior police statements as prior inconsistent statements did not violate the Confrontation Clause. See Crawford, 541 U.S. at 60 n.9; see also Jaiman, 850 A.2d at 989 ("[T]he Confrontation Clause 'guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'").

**C**

**Remaining Arguments**

The defendant also contends that the leading questions that the prosecutor was permitted to ask Long were prejudicial. When reviewing leading questions posed to another witness suffering from jailhouse amnesia, this Court declared,

> "Although leading questions generally are prohibited on direct examination, they may be allowed for a limited purpose such as to guide the testimony of a hostile or a purportedly forgetful witness.
>
> "Here, it is clear that [the witness's] appearance at trial was anything but cooperative; he experienced a failure of memory that could be characterized as hostile and lacking in credibility. A party is entitled to treat a forgetful witness as adverse; and, in an effort to elicit truthful testimony from the witness, the examiner may resort to leading questions. It is within the discretion of the trial justice to decide whether to allow the examiner to lead; that discretion, however, is not without limit." McManus, 990 A.2d at 1236.

- 15 -

Although in <u>McManus</u>, the trial justice came "dangerously close to a prejudicial abuse of discretion," we deemed any error to have been harmless "in light of our decision upholding the introduction of [the witness's] statement to the police." <u>Id.</u> In this case, we are of the opinion that error, if any, arising from the use of leading questions by the state was harmless based on our conclusion that Long's police statement was admissible as a prior inconsistent statement. This holding simply recognizes the difficulty inherent in attempting to refresh the recollection of an unwilling witness without resort to leading questions. This is a decision left to the discretion of the trial justice.

The defendant also argued that his due process rights were violated because Long's statement was obtained without counsel and was the product of coercion. This argument, however, was not raised to the trial justice below. Therefore, it was waived. <u>See</u> <u>State v. Bido</u>, 941 A.2d 822, 828-29 (R.I. 2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.").

### III

**Admission of Jeannine Labossiere's Testimony as an Adoptive Admission**

The defendant argues that Long's statements to Labossiere should not have been admitted as adoptive admissions by defendant. At trial, Labossiere testified that Long and defendant came to her house at 1 a.m. on May 7, 2009. She noticed that defendant was limping and that Long had a bandana wrapped around his hand; thus, she sensed that something was amiss. After she repeatedly asked them what happened, Long admitted that "they robbed a Domino delivery guy." According to Labossiere, defendant "looked a little mad that Long said something" to her, but he remained silent. Long then provided additional details about the crime, including that he gave Labossiere's cell phone to defendant so that defendant could call Domino's and place an order

for delivery to an abandoned house. Long disclosed that, when Lopez approached the house, defendant grabbed him and put him in a choke-hold. At that point, it was defendant who demonstrated the choke-hold to Labossiere. She also testified that Long described Lopez as badly beaten and that he got away a couple of times such that defendant had to put him back in the choke-hold. Shocked at these revelations, Labossiere said to them, "What the hell did you guys do?" She testified that defendant responded, "We just told you what we did." (Emphasis added.) When she inquired about the fruits of the robbery, defendant told Labossiere that he bought her a pack of cigarettes and produced about $15 in cash.

A trial justice's evidentiary rulings are reviewed under an abuse of discretion standard. McManus, 990 A.2d at 1234. Rule 801(d)(2)(B) provides that "[a] statement is not hearsay if * * *[t]he statement is offered against a party and is * * * a statement of which the party has manifested his or her adoption or belief in its truth[.]" It is well settled that "silence is sometimes sufficient to signify adoption." Day, 925 A.2d at 983. Where an accusatory statement was made within hearing distance of an accused and the accused did not respond to the accusation, this Court has pointed to five factors to consider in deciding whether a purported adoptive admission results:

> "(1) whether the statement was incriminating or accusatory; (2) whether it was one to which an innocent person in the defendant's situation would respond; (3) whether the statement was made within the presence and hearing range of the defendant; (4) whether it was understood by the defendant; and (5) whether the statement was one to which the defendant had an opportunity to respond." Id.

We are satisfied that this case represents a use of classic adoptive admissions. Long implicated defendant in a robbery; thus, the statement was clearly incriminating. Furthermore, an innocent person would certainly respond to such a direct suggestion of robbery. Labossiere also testified that Long and defendant were standing side-by-side—clearly within hearing range.

- 17 -

The fact that defendant looked annoyed by Long's initial disclosure of the robbery and later demonstrated the choke-hold he applied to subdue Lopez establish that he not only understood the statements, but that he also had an opportunity to respond; additionally, evidence that defendant demonstrated the choke-hold is an admission by conduct. If defendant's silence during Long's initial disclosure was not enough to establish an adoptive admission, defendant later affirmed his participation in the robbery by telling Labossiere, "[w]e just told you what we did." Accordingly, the trial justice did not err by admitting Long's statements to Labossiere in the presence of defendant as adoptive admissions.

**IV**

**Denial of Defendant's Motion for a New Trial**

The defendant contends that the trial justice erred by denying his motion for a new trial. "When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting State v. Texieira, 944 A.2d 132, 140 (R.I. 2008)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Id. Only when the trial justice does not agree with the jury's verdict must he or she consider whether reasonable minds could differ as to the outcome. State v. LaPierre, 57 A.3d 305, 310 (R.I. 2012). "[W]hen 'the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight'

and we will disturb it only if the trial justice 'has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong.'" State v. Ferreira, 21 A.3d 355, 365 (R.I. 2011) (quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994)).

In this case, the trial justice thoroughly recounted the evidence witness-by-witness. She made credibility determinations as to the key witnesses; specifically, she found that Lopez and Labossiere were credible and that the defendant, his mother, and Long were not credible witnesses. Ultimately, the trial justice agreed with the jury's verdict and denied the motion for a new trial. Primarily, the defendant seizes upon the trial justice's apparent misstatement that it was the defendant who told Labossiere that he and Long had robbed a Domino's delivery-person. While the defendant is correct—the record discloses that it was Long who made the disclosure—this error is immaterial to the decision denying the defendant's motion for a new trial. Although the defendant did not directly declare, "we robbed a Domino's delivery guy," his silence and demonstrative conduct permit the factfinder to draw an inference that the defendant adopted that statement. Furthermore, as noted by the trial justice, the defendant demonstrated his choke-hold for Labossiere and also responded to her question by saying, "We just told you what we did." Therefore, the trial justice did not overlook or misconceive material evidence relating to a critical issue in this case. Accordingly, she did not err by denying the defendant's motion for a new trial.

## Conclusion

For the reasons articulated above, we affirm the conviction. The papers may be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**


*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Marcus Matthews

**CASE NO:**        No. 2011-398-C.A.
                    (P1/09-3674A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   April 11, 2014

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                    Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

                    For State:  Aaron L. Weisman
                            Department of Attorney General

                    For Defendant:  David D. Prior, Esq.